**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Danielle Wellington, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No:   5:20-CV-1367 (DNH/ML) |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| Empower Federal Credit Union, DOES 1 Through 5, | ) ) ) | |
| Defendants. | ) ) ) | |

## TABLE OF CONTENTS

NATURE OF THE ACTION ...................................................................................2

PARTIES...............................................................................................................4

JURISDICTION AND VENUE ..............................................................................5

BACKGROUND ...................................................................................................5

A.     Defendant Empower ...............................................................................5

B.     Plaintiff .................................................................................................8

C.     Regulation E ..........................................................................................9

D.     Empower's Regulation E Practices ..........................................................19

FACTUAL ALLEGATIONS AGAINST DEFENDANT.......................................21

CLASS ACTION ALLEGATIONS ......................................................................23

FIRST CAUSE OF ACTION ...............................................................................28

SECOND CAUSE OF ACTION ..........................................................................31

PRAYER FOR RELIEF .......................................................................................32

DEMAND FOR JURY TRIAL ............................................................................33

i

Plaintiff Danielle Wellington ("Plaintiff") brings this lawsuit against Empower Federal Credit Union ("Empower" or "Defendant") on the basis that Empower has violated and continues to violate Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq.* ("Reg E" or "Regulation E"), which requires financial institutions to provide complete, accurate, clear, and easily understandable disclosures of their overdraft services and obtain affirmative customer consent before the financial institution can lawfully charge overdraft fees on non-recurring debit transactions and ATM withdrawals. Specifically, Empower intentionally provides its members with an opt-in disclosure which purports to inform what they "Need[s] to Know about Overdraft and Overdraft Fees," but that document provides ambiguous and inaccurate language to describe under what circumstances a customer is subject to an overdraft fee. Accordingly, as Empower has adopted a noncompliant opt-in disclosure agreement to obtain consent under Regulation E, it may not assess overdraft fees to its customers on Regulation E transactions. Despite this, Empower routinely assesses overdraft fees on non-recurring debit transactions and ATM withdrawals.

Regulation E itself provides a cause of action for failing to abide by its disclosure requirements. That violation is also actionable as a standalone cause of action under New York's Gen. Bus. L. § 349 ("NY GBL § 349"). Plaintiff thus seeks restitution of improperly charged overdraft fees within the statute of limitations period and a public injunction to enjoin Defendant from harming the general public by continuing to obtain new customers' "consent" to assess overdraft fees on Regulation E transactions by using an opt-in Empower agreement in violation of Regulation E. Plaintiff also seeks an injunction to prevent Empower from assessing any further overdraft fees on Regulation E transactions until it obtains the consent of customers using an opt-in disclosure agreement that conforms with Regulation E.

1

## **NATURE OF THE ACTION**

1.      All allegations herein are based upon information and belief except those allegations pertaining to Plaintiff or counsel.  Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff or counsel's personal knowledge, as well as Plaintiff or counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      Plaintiff has brought this class and representative action to assert claims in her own right, and as the class representative of all other persons similarly situated.  Regulation E requires Defendant Empower to obtain informed consent, by way of a written standalone document that fully and accurately describes in an easily understandable way its overdraft services, before charging accountholders a fee for covering certain overdraft transactions. Because of the substantial harm to customers of significant overdraft fees on relatively small debit card and ATM transactions, financial institutions are required to put all the important overdraft information in one document that is clear and easily understood.  Financial institutions are not permitted to circumvent this requirement by reference to, or reliance on their account agreements, disclosures, or marketing materials.  Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies.

3.      Empower has failed to meet to this requirement by using an opt-in disclosure agreement that ambiguously and/or inaccurately describes the circumstances of when a paid transaction qualifies for an overdraft fee.  Specifically, on information and belief, Empower

2

defines an overdraft in the opt-in disclosure agreement as when there is *not enough money* in the account to pay the transaction, *but Empower pays it anyway*.  But Empower's automated decision to assess overdraft fees is not based on whether there is enough money in the actual account balance to pay the transaction as stated by the opt-in disclosure agreement.  Instead, it is based on an artificially reduced calculation created by Empower's internal bookkeeping called the "available balance," which deducts holds for future transactions.  When these future holds are accounted for, the calculation often results in a negative "available balance" existing only on paper, even as there is actually money in the account at the time of payment and posting to cover the transaction without a negative account balance.

4.      Accordingly, Empower's opt-in disclosure agreement has not only failed to clearly disclose to the customer which balance is used to assess an overdraft fee (which is all that is required for a Reg E violation), it suggests that its overdraft policies apply an accountholder's actual balance when determining whether to charge an overdraft fee, when it actually uses a different, artificially lower balance.  Empower's use of the artificially reduced account balance instead of the actual account balance to determine whether to assess overdraft fees is material, resulting in Empower assessing overdraft fees on 10-20% more Reg E transactions than it otherwise would.

5.      Plaintiff has been harmed by Defendant's violation of Reg E.  She was opted-in to the disclosure agreement using the ambiguous, inaccurate and misleading description of Empower's overdraft practices, and has been assessed overdraft fees on Reg E transactions that Empower was not allowed to assess because it used a noncompliant Reg E opt-in disclosure agreement.  This action seeks monetary damages under Reg E, restitution, and injunctive relief due to, *inter alia*, Defendant's policy and practice of using a noncompliant opt-in disclosure

agreement, unlawfully assessing and unilaterally collecting overdraft fees on Reg E as set forth herein.

## **PARTIES**

6.      Plaintiff Danielle Wellington is a resident of New York, and an accountholder with Empower at all relevant times.

7.      Based on information and belief, Defendant Empower is and has been a credit union with its headquarters located in Syracuse, New York, and branches throughout New York state.  Empower's National Credit Union Administration charter number is 3025.

8.      Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations.  As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

9.      Plaintiff is unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

10.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

11.     At all material times herein, each Defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose,

scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other Defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

12.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

13.     As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, and 28 U.S.C. § 1367(a).

15.     Venue is proper in this District because Empower transacts business, Plaintiff and similarly situated persons entered contracts with Empower, and Empower executed its unlawful policies and practices, which are the subject of this action, in this District.

## BACKGROUND

A.     **Defendant Empower**

16.     Defendant is a federal credit union headquartered in Syracuse, NY with approximately 21 branches and ATM machines throughout New York state.  According to its financial filings, as of December 31, 2019, Defendant has approximately 211,959 credit union

members (*i.e.*, customers), 524 full-time employees, and holds $1.9 billion in assets.  It reports

that in 2019 alone, it collected $18 million in fee income, of which overdraft fees are a

significant percentage of those fees.

17.     One of the main services Defendant offers is checking accounts.  A checking

account balance can increase or be credited in a variety of ways, including automatic payroll

deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM

machines.  Debits decreasing the amount in a checking account can be made by using a debit

card for purchases of goods and services (point of sale purchases) that can be one-time purchases

or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic

purchases.  Additionally, some of the other ways to debit the account include writing checks;

issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can

include recurring automatic payments or one-time payments); transferring funds; and other types

of transactions that debit from a checking account.

18.     In connection with its processing of debit transactions (debit card, ATM, check,

ACH, and other similar transactions), Defendant assesses overdraft fees (a fee for paying an

overdrawn item) and NSF fees (a fee for a declined, unpaid returned item) to accounts when it

claims to have determined that an account has been overdrawn.

19.     The underlying principle for charging overdraft fees is that when a financial

institution pays a transaction by advancing its own funds instead of the accountholder's

insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the

fee is not prohibited by some legal regulation.  The fee Defendant charges here constitutes very

expensive credit that harms the poorest customers and creates substantial profit to the financial

institution.  According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[1]

- Overdraft and non-sufficient funds (NSF) fees constitute the majority of the total checking account fees that customers incur.

- The transactions that lead to overdrafts are often quite small.  In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a *17,000* percent annual percentage rate (APR)**. (emphasis added)[2]

20.     Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions.  According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[3]

21.     Defendant's financial filings and practices reveal that it has followed these trends to the letter.  Defendant charges an overdraft/NSF fee of $35.00 per item, with a purported limit of five (5) overdraft charges per day.  Even if Defendant had been properly charging overdraft fees, the $35.00 overdraft fee bears no relation to the financial institution's minute risk of loss or

---

[1] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Nov. 2, 2020).

[2] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Nov. 2, 2020).

[3] Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited Nov. 2, 2020).

cost for administering overdraft services.  But the fee's practical effect is to charge those who pay it an interest rate with an APR in the thousands.

22.    Accordingly, the overdraft fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee.  Further, in a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[4]  In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[5]  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program, (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, (*id*. at p. 10).

23.    Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees.  Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees.  *Id*. at p. 3.  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  *Id*. More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  *Id*. at p. 4.  And non-whites are 83% more likely to pay an overdraft fee than whites.  *Id*. at p. 3.

**B.    Plaintiff**

24.    Plaintiff Danielle Wellington is a resident of the state of New York and a customer of Defendant.  Plaintiff opened her account with Empower on or around August 2019

---

[4] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited Nov. 2, 2020).

[5] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Nov. 2, 2020).

and was opted into Empower's overdraft program—dubbed "Courtesy Pay"—for one debit card and ATM transactions.  Plaintiff was assessed an overdraft fee on a one-time debit card/atm transaction on September 7, 2020.  Based on information and belief, that overdraft fee has not been refunded to Plaintiff at the time of filing this complaint.  Further, Plaintiff has been charged on multiple occasions overdraft fees on nonrefunded one-time debit card ATM and/or one-time debit card transactions.  The extent of those charges will be determined in the course of discovery using Defendant's records.  All of these overdraft charges were assessed on the basis of Plaintiff's "available balance," even though Empower's opt-in disclosure agreement explains that an overdraft only occurs "when you do not have enough money in the account to cover the transaction," a description of the "actual" balance of an account.

## C.    Regulation E

25.    For many years, banks and credit unions have offered overdraft services to their accountholders.  Historically, the fees generated by these services were relatively low, particularly when methods of payment were limited to cash, check, and credit card.  But the rise of debit card transactions replacing cash for smaller transactions—especially for younger customers who carried lower balances—provided an opportunity for financial institutions to increase the number of transactions in a checking account that could potentially be considered overdraft transactions, and for which the financial institution could assess a hefty overdraft fee. The increase in these types of transactions was timed perfectly for financial institutions, which faced falling revenue as a result of lower overall interest rates and the rise of competitive innovations such as no-fee checking accounts.  Financial institutions thus recognized in overdraft fees a new and increasing revenue stream sufficient to recover from the loss of once-expected revenue streams.

26.     As a result, the overdraft process became a primary source of revenue for financial depository institutions—banks and credit unions—both large and small.  As such, financial institutions are generally eager to provide overdraft services to consumers because not only do overdrafts generate revenue, but as explained above, they do so with low risk.

27.     The reason why is because the financial institution does not always have to pay an overdraft item.  Instead, an overdraft is only created when the financial institution voluntarily decides to advance its own funds to pay the overdraft.  If the financial institution does not want to cover the overdraft, it can simply decline the item and return it unpaid.  Moreover, most financial institutions will charge the same fee to the accountholder even if they do not cover the overdraft, calling this fee a "non-sufficient funds," or "NSF" fee, instead.  And when an overdraft is covered, it is on average repaid in three days, meaning that the financial institution advances small sums of money for no more than a day or two.

28.     An overdraft thus occurs when two conditions are satisfied.  First, the accountholder initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction.  Second, the financial institution then agrees to advance its own funds to cover the shortfall.  An overdraft, therefore, is much like an extension of credit. The financial institution paying the overdraft allows the accountholder to continue using the account even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[6]  The financial institution uses its own money to pay the transaction, on the assumption that the accountholder will eventually cover the shortfall.

---

[6] For a thorough description of the mechanics of an "overdraft," see https://www.investopedia.com/terms/o/overdraft.osp (last visited Nov. 2, 2020).

29.     But in many cases, financial institutions are not covering large money shortages. Far more often, the consumer has made a minor purchase with a debit card—perhaps for groceries or even a $4 dollar cup of coffee.  Moreover, in a substantially large sub-set of those cases, as in the situation that gives rise to this lawsuit, the consumer actually has the money sitting in his or her account to cover the purchase (meaning no overdraft has occurred), but the financial institution has put a temporary hold on it for some reason.

30.     Before the Federal Reserve adopted Regulation E, many financial institutions unilaterally adopted internal "overdraft payment" plans.  Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would go ahead and cover the overdraft while charging the standard overdraft fee.  Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or instead declined and providing the opportunity to select another form of payment rather than turning the $4 cup of coffee into a $40 cup of coffee with the overdraft fee.

31.     The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft programs.  Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all.  It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders for overdraft coverage of ATM and non-recurring "point of sale" debit card transactions.  After Regulation E's adoption, a financial

institution could only charge an overdraft fee on one-time debit card purchases and ATM withdrawals if the consumer opted into the financial institution's overdraft program.  Otherwise, the bank or credit union could either cover the overdraft without charging a fee or, simply direct the transaction to be denied at the point of sale.  Further, without the opt-in, there could be no NSF fee incurred because the denial of the transaction meant no transaction had taken place, and thus no transaction to return unpaid.

32.     The CFPB subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs. Unsurprisingly, the CFPB found that overdraft programs had a series of problems.  But the most pressing problem was that overdraft services were costly and damaging to accountholders.  The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average overdraft and NSF-related fees paid by accounts that paid fees was $225. The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts.  The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[7]

33.     Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees.  Banks and credit unions in this scenario had

---

[7] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management."  69 Fed. Reg. 31761 (June 7, 2004).

significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest (using averages - 17,000% APR), all with almost no risk as only a very small percentage of the overdraft customers failed to repay the overdraft.

34.     Because of this, Regulation E did not merely require a financial institution to obtain an opt-in disclosure agreement before charging fees for transactions that result in overdrafts. It also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document, not combined with other forms, disclosures, or contracts provided by the financial institution. It must also accurately disclose to the accountholder the institution's overdraft charge policies. The accountholder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 205.4(a)(1). The financial institution must ultimately establish that the accountholder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure agreement.

35.     In the wake of Regulation E, some financial institutions simply decided to forego charging overdraft fees on non-recurring debit card and ATM transactions. These include large banks such as Bank of America, and smaller banks such as One West Bank, First Republic Bank, and Mechanics Bank. However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals. As such, these banks and credit unions

must satisfy the requirements of Regulation E in order to obtain sufficient consent from their accountholders before charging overdraft fees on eligible transactions.

36.     But charging these exorbitant penalty fees for the bank or credit union's small advance of funds to cover overdrafts was not where it stopped.  Financial institutions began manipulating the process as to when they would consider a transaction an overdraft to further increase their profit from the overdraft programs.  They charged overdraft fees no longer just when the financial institution actually advanced money on behalf of the customer, but assessed overdraft fees on transactions when they paid the transaction with the customers' money.  That is, the financial institution unilaterally decided the account was overdrawn not by the actual lack of funds in the account, but by whether the money in the account minus holds for future events was enough to cover an ATM or debit transaction.

37.     Most banks and credit unions calculate two account balances related to their accounting of a customer checking account.  "Actual balance," "ledger balance," or "current balance" are all terms used to describe the actual amount of the accountholder's money that is in the account at any particular time.  In contrast, "available balance" is a term the financial industry recognizes as a balance reduced from the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.[8]

38.     Although financial institutions calculate two balances, the actual/ledger/current balance of the money in the account is the official balance of the account.  It is used when financial institutions report deposits to regulators, when they pay interest on an account, and

---

[8] Some financial institutions also use a third balance called the collected balance, which is also an internal calculated balance that is the actual account balance minus only deposit holds, and does not include debit holds.

when they report the amount of money in the account in monthly statements to the customer—the official record of the account.

39.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual balance or the "available balance" for overdraft assessment purposes, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed.  Thus, when banks and credit unions use the artificial "available balance" to determine whether an account transaction is considered an overdraft, it must be disclosed in the opt-in disclosure agreement.

40.     Many financial institutions use the "available balance" for overdraft assessment purposes as it is consistent with these institutions' self-interest because the available balance is always the same or lower, by definition, than the actual balance.  The actual balance includes all money in the account.  The available balance, on the other hand, always subtracts any holds placed on the funds in the account that may affect the money in the account in the future.  It never adds funds to the account.  To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account.  The financial institution's "hold" is merely an internal characterization the bank or credit union uses to define some of the money.  All of the accountholder's money remains in the account, even the money Empower has defined as "held."  The fact that the money has a "hold" on it does not mean it has been removed from the account.[9]

41.     The difference between which of the two balances a financial institution may use

---

[9] If the financial institution uses the actual balance to determine whether an account is in overdraft, as does, *e.g.*, MidFlorida Credit Union, it looks strictly at the amount of funds in the account.  https://www.midflorida.com/terms-and-conditions/overdraft-agreement/ (last visited Nov. 2, 2020).  If there is sufficient money in the account to cover a transaction—even if the money is subject to a hold for pending transactions—then the financial institution will not charge an overdraft fee.

to calculate overdraft transactions is material to both the financial institution and accountholders. Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that that are assessed overdraft fees approximately 10-20%. What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer. At all times, the financial institution uses the customer's own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

42.     A hypothetical demonstrates what the financial institution is doing under these circumstances. Suppose that an individual has $1,000 dollars. The individual intends to use $800 of this amount to pay rent. The individual then intends to use the other $200 to make his monthly car payment. But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or his water service will be cut off. The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill. This individual has not spent more money that he has on hand —but he does need to find an additional $40 before the car payment comes due. And if the individual does find the additional $40 before paying the car payment, there will never be a problem. If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill. He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

43.     The same pattern holds for a credit union that calculates overdrafts using the actual (or ledger or current) balance of an account. Suppose the same individual put the $1,000 in his checking account under similar circumstances on the 27th of the month. That day, he also

authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month.  The individual then realizes that the $40 payment on his water bill must be paid that day—the 27th of the month—or he will incur a fee.  He approves the water bill payment, and it posts immediately.  Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car payments post and clear the account.  All three payments are made with the individual's own account funds.  The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive.  However, even if customer does not transfer the $40, it is only the car payment which posts last that is paid without sufficient money in the account to cover it.  Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

44.     A credit union that uses the "available balance" method of calculating overdrafts would come to a different conclusion.  Because the available balance subtracts from the account the amount of money that the credit union is "holding" for other pending transactions, the credit union considers the money set aside and unavailable, even though it is still in the account.  This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account.  Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account.  And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the credit union never "covered" any portion of the payment with its own funds.  Finally, what is worse still, if the customer does not make a deposit to cover

the overdraft, the customer will be assessed a second overdraft fee when the last transaction posts

to the account.  Thus, using the available balance, although the financial institution only has to

advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will

assess two overdraft fees (one for the water bill payment and one for the car payment) doubling

its profits from the same transactions.

45.     Financial institutions have been put on notice by regulators, banking associations,

their insurance companies and risk management departments, and from observing litigation and

settlements that the practice of using the available balance instead of the actual amount of money

in the account (*i.e.*, the actual, ledger, or current balance) to calculate overdrafts without clear

disclosure of that practice likely violates Reg E and state consumer laws.  For instance, the FDIC

stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger
> balance" method to assess overdraft fees. The FDIC identified issues regarding certain
> overdraft programs that used an available balance method to determine when overdraft
> fees could be assessed. Specifically, FDIC examiners observed potentially unfair or
> deceptive practices when institutions using an available balance method assessed more
> overdraft fees than were appropriate based on the consumer's actual spending or when
> institutions did not adequately describe how the available balance method works in
> connection with overdrafts.[10]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:

> A ledger-balance method factors in only settled transactions in calculating an account's
> balance; an available-balance method calculates an account's balance based on electronic
> transactions that the institutions have authorized (and therefore are obligated to pay) but
> not yet settled, along with settled transactions. An available balance also reflects holds on
> deposits that have not yet cleared. Examiners observed that in some instances,
> transactions that would not have resulted in an overdraft (or an overdraft fee) under a
> ledger-balance method did result in an overdraft (and an overdraft fee) under an
> available-balance method. At one or more financial institutions, examiners noted that
> these changes to the balance calculation method used were not disclosed at all, or were
> not sufficiently disclosed, resulting in customers being misled as to the circumstances

---

[10] https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last
visited Nov. 2, 2020).

under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[11]

46.     Under Regulation E, the financial institution may decide which balance it chooses to assess overdraft fees on one-time debit card and ATM transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood.  As the Regulation E opt-in disclosure agreement must include this information in a standalone document, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution from charging that customer overdraft fees on one-time debit card and ATM transactions.  Either inaccurately or failing to describe the use of available balance as part of its overdraft practice violates the plain language of Regulation E.

**D.     Empower's Regulation E Practices**

47.     On information and belief, Empower opted-in its customers using an opt-in disclosure agreement titled *Courtesy Pay*, which is how Empower describes it overdraft system. A reasonable consumer reading a disclosure agreement that requires a signature or acknowledgement, and only relates to overdrafts and overdraft fees and represents that it contains information the customer needs to know about overdrafts and overdraft fees, would rely on the opt-in disclosure agreement without supplementing that knowledge with reference to other marketing materials and or account agreement language relating to overdrafts.

48.     The opt-in disclosure agreement explained that an overdraft "occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  The agreement makes no reference to "available" balance, "available" funds or money, or any

---

[11] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Nov. 2, 2020).

description of how the credit union's internal hold policies affect the balance.  The opt-in

disclosure agreement instead only explains that an overdraft occurs when there is not enough

"money in [the] account."

49.     By defining overdrafts in this way, it is reasonable and expected for

accountholders to understand that Empower uses the actual balance and money in the account to

calculate whether an overdraft has occurred.[12]  Many courts have already found that this exact

same language is at least ambiguous as to whether it means the actual balance or available

balance is used in determining overdraft fees.[13]  By using ambiguous language to describe what

constitutes an overdraft, Empower by definition has failed to provide a clear and easily

understandable description of its overdraft services as Regulation E requires in its opt-in

disclosure agreement.

50.     Other financial institutions that use the available balance to calculate overdrafts

have specifically addressed doing so in their opt-in disclosure agreements.  San Diego County

Credit Union, for example, defines an "overdraft" as when "the available balance in your account

is nonsufficient to cover a transaction at the time that the transaction posts to your account, but

---

[12]     Empower also provides some customers with an overdraft line of credit.  In instances where there is an overdraft line of credit, Empower's overdraft service kicks in once the limits on that line of credit have been reached.

[13] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1239-40 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-64 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 854-56 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–7 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 374–75 (D. Conn. 2018) (holding there was a "reasonable basis for a difference of opinion" regarding definition of "insufficient funds"); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-5 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3 (D. Nev. June 22, 2016).

we pay it anyway."  Synovus Bank defines an overdraft similarly to Empower, but adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance.  TD Bank's opt-in disclosure agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway.  Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy."  Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway.  'Available Balance' is your account balance less any holds placed on your account."

51.     Here, Empower's failure to accurately, clearly, and in an easily understandable way identify the balance Empower uses to assess overdraft fees in the standalone opt-in disclosure agreement, resulted in its failure to obtain the appropriate informed consent necessary to opt customers into its overdraft program.  Empower thus charged customers overdraft fees for non-recurring debit cards and ATM transactions in violation of Regulation E.  And Empower continues to charge customers overdraft fees on one-time debit card and ATM transactions even though Regulation E forbids it from doing so without obtaining the required consent.

## FACTUAL ALLEGATIONS AGAINST DEFENDANT

52.     At all relevant times, Defendant used the "available balance," and not the actual account balance, to determine whether to assess overdraft fees on one-time debit card and ATM transactions.

53.     At all relevant times, the Defendant knew or should have known, that in order to

legally charge its customers overdraft fees, it was required to first obtain affirmative consent from the customer using an opt-in disclosure agreement that complied with Regulation E.

54.     At all relevant times, Defendant used an identical opt-in disclosure agreement with Plaintiff and all putative class members that defined an overdraft as occurring "when you do not have enough money in your account to cover a transaction, but we pay it anyway."

55.     This definition of overdraft would disclose and be interpreted by  reasonable customers to mean as follows: (1) "not enough money in your account" means the Actual balance/Current Balance/Ledger Balance in the account; (2) to "cover a transaction" means that the overdraft decision is made at time of posting and payment; and (3) "we pay it anyway" means that the Defendant has advanced or loaned the customer money to pay the transaction. However, as the Defendant determines overdraft fees based on the "available balance" that factors in credit and debit holds, approximately 10-20% of overdraft fees are assessed on transactions when there was money in the account to cover the transaction at the time it was posted and paid, and Defendant did not advance or loan the customer any money to pay the transaction.

56.     The opt-in disclosure agreement did not accurately and in a clear and easily understandable way describe Empower's overdraft services, and as such the opt-in disclosure agreement did not comply with Regulation E.

57.     Because Defendant used an opt-in disclosure agreement that did not accurately describe an overdraft and thus was not compliant with Regulation E, it was not permitted to charge customers overdraft fees on one-time debit card and ATM transactions.

58.     Based on information and belief, at all relevant times, Defendant knew it was using the available balance to assess overdraft fees, and further knew or should have known that

as a stand-alone document, the opt-in disclosure agreement was not providing an accurate, clear and easily understandable definition of an overdraft when it identified an overdraft as "when you do not have enough money in your account to cover a transaction, but we pay it anyway."

59.     At all relevant times, Defendant charged Plaintiff and the putative class overdraft fees on one-time debit card and ATM transactions even though it had not complied with Regulation E to first obtain customers' affirmative consent using a Regulation E compliant opt-in disclosure agreement before it charged these fees.

60.     Based on information and belief, Defendant continues to "opt-in" in customers using an opt-in disclosure agreement that does not comply with Regulation E, and then charges those customers overdraft fees on one-time debit card and ATM transactions.

61.     Based on information and belief, Defendant continues to charge existing customers overdraft fees on one-time debit card and ATM transactions who had "opted-in" using an opt-in disclosure agreement that did not and does not comply with Regulation E.

## CLASS ACTION ALLEGATIONS

62.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

63.     Plaintiff brings this case, and each of the respective causes of action, as a class action.

64.     The "Class" is composed of one of the following:

**The Regulation E Class:**

> **All members and customers of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of this complaint and ending on the date the Class is certified.  Following discovery, this definition will be amended as appropriate.**

23

**The NY GBL § 349 Class:**

> All members and customers of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning three-years preceding the filing of this complaint and ending on the date the Class is certified.  Following discovery, this definition will be amended as appropriate.

65.     Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

66.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Fed. R. Civ. P. 23.

67.     **Numerosity** – The members of the Class ("Class Members") are so numerous that joinder of all Class Members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with credit unions with similar practices, that the Class is likely to include thousands of members.

68.     Upon information and belief, Defendant has databases, and/or other documentation, of its members' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's members has been harmed by its practices and thus qualify as a Class Member.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice through mail or email, alternative proper and sufficient notice of this action

24

may be provided to the Class Members through notice published in newspapers or other publications.

69.     **Commonality** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- Whether Defendant used the available balance for making a determination of whether to assess overdraft fees on one-time debit card and ATM transactions;

- Whether the opt-in disclosure agreement used by Defendant to opt-in Class Members violated the mandate of Regulation E that the opt-in disclosure agreement must accurately, clearly, and in an easily understandable way describe the overdraft services of Defendant;

- Whether Defendant breached Regulation E when it assessed overdraft fees on one-time debit card and ATM transactions against Class Members;

- Whether Defendant's conduct in violating Regulation E also violated the NY GBL § 349; and

- Whether Defendant continues to violate Regulation E and the NY GBL § 349 by opting in customers using an opt-in disclosure agreement that violates Regulation E and continuing to assess customers overdraft fees on one-time debit card and ATM transactions based on an opt-in disclosure agreement that violates Regulation E.

70.     **Typicality** – Plaintiff's claims are typical of all Class Members.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the opt-in disclosure

agreement used to opt-in Plaintiff is the same as the opt-in disclosure agreement used by the Defendant to opt-in the Class Members.  Further, Plaintiff and the Class Members have each been assessed overdraft fees on one-time debit card and ATM transactions.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

71.    **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members.  Plaintiff has retained competent counsel experienced in class action litigation, and specifically financial institution overdraft class action cases to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and her counsel intend to prosecute this action vigorously.

72.    **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

73.     Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is desirable for this litigation because Defendant's headquarters are located in this District and the claims arose from activities that occurred largely therein.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

74.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

75.     This matter is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 in that without class certification and determination of declaratory, injunctive, statutory and other

legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

76.    Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

## **FIRST CAUSE OF ACTION**
### **(Violation of Regulation E)**

77.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

78.     By charging overdraft fees on ATM and nonrecurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

79.     Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E.  12 C.F.R. § 1005.17.  The Opt In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  *Id*. (emphasis added).  The notice "shall be clear and readily understandable."  12 C.F.R. § 1005.4(a)(1).  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.  Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

80.     The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the

Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

81.     Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers in a "clear and readily understandable way" a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but Defendant pays it anyway, when, in fact, Defendant assesses overdraft fees even when there is enough money in the account to pay for the transaction and Defendant does not have to advance any funds.  This is accomplished by use of the internal bookkeeping available balance to assess overdraft fees, rather than the actual and official balance of the account.  Defendant failed to use language to describe the overdraft service that identified that it was using available balance to assess overdraft fees, which meant that in a significant percentage of the transactions that were the subject of the overdraft fee, there was money in the account to cover the transaction and Defendant did not have to advance any money – yet Defendant assessed an overdraft fee anyway.

82.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

83.     As the result of Defendant's violation of Regulation E, 12 C.F.R. § 1005.17, *et seq.*, Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

### SECOND CAUSE OF ACTION
**(Violation Of NY GBL § 349)**

84.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

85.     NY GBL § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

86.     As alleged herein, Defendants engaged in deceptive acts and practices in the form of material misrepresentations and misleading statements in their opt-in disclosure agreement, that an overdraft "occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  A reasonable interpretation of this statement is that it means actual money in the account (actual balance) rather than money in the account that is held for *future* expenses.  However, Defendants failed to disclose that its overdraft fees are assessed under an "available balance" measure rather than a "actual balance" or "ledger balance" measure, resulting in overdraft fees paid *even in instances when there is enough money in*

31

*account to cover a transaction*, which renders Defendant's statement in its opt-in disclosure agreement materially false and/or misleading.

87.     Defendants knew or should have known that their acts, practices, statements, policies, correspondences, and representations, as discussed above, were false and likely to deceive and mislead Plaintiff and the Class members.

88.     Plaintiff and the Class members have been injured as a result of Defendants' violations of Gen. Bus. Law § 349(a), as they have been charged deceptive overdraft fees.

89.     Defendants' deceptive and misleading acts and practices have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the other members of the Class and has had a broader impact on consumers and the public at large.  Instead of disclosing the measure Defendants use to assess overdrafts, Empower has been unjustly enriched at the expense of consumers by charging deceptive overdraft fees even in instances where Empower does not use its own funds to cover payments.

90.     Thus, Plaintiff and the Class are entitled to pursue claims against Defendants pursuant to Gen. Bus. Law § 349 (h) to redress Defendants' violations of Gen. Bus. Law § 349(a).

91.     Plaintiff and the Class thus ask this Court to award them equitable relief, restitution, civil penalties, punitive damages, attorney fees, consequential damages, and all other damages available at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.     For an order certifying this action as a class action;

2.     For compensatory damages on all applicable claims and in an amount to be

proven at trial;

      3.      For an order requiring Defendant to disgorge, restore, and return all monies

wrongfully obtained together with interest calculated at the maximum legal rate;

      4.      For statutory damages;

      5.      For punitive damages;

      6.      For an order enjoining the continued wrongful conduct alleged herein;

      7.      For costs;

      8.      For pre-judgment and post-judgment interest as provided by law;

      9.      For attorneys' fees under the Electronic Fund Transfer Act, the common fund

doctrine, and all other applicable law; and

      10.    For such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: November 4, 2020             Respectfully Submitted,


                                */s/ Sherief Morsy*

                                Elaine S. Kusel*
                                esk@mccunewright.com
                                Sherief Morsy
                                sm@mccunewright.com
                                **McCune Wright Arevalo, LLP**
                                One Gateway Center, Suite 2600
                                Newark, NJ 07102
                                Telephone: (909) 557-1250
                                Facsimile: (909) 557-1275

                                Richard D. McCune, CA Bar No. 132124**
                                rdm@mccunewright.com
                                **McCune Wright Arevalo, LLP**

3281 East Guasti Road, Suite 100
Ontario, CA 91761
Telephone: (909) 557-1275
Facsimile: (909) 557-1275

Attorneys for Plaintiff Danielle Wellington,
and the Putative Class

*Application for admission to be submitted
**_Pro Hac Vice_ application to be submitted

34